THE PEOPLE OF THE STATE OF NEW YORK ex rel. ELIZABETH B. BRIGGS, Relator, *v.* JOHN J. HANLEY, Warden of the City Prison of the City of New York, Defendant.

THE PEOPLE OF THE STATE OF NEW YORK, Appellant.

First Department, January 10, 1919.

**Crime — what constitutes crime of receiving stolen property under section 1308 of Penal Law — necessity that identical property stolen be received.**

Under section 1308 of the Penal Law, there must be three concurring facts to constitute the crime of receiving stolen property: (1) The property must have been stolen by some one; (2) it must have been bought, received, concealed or withheld by a certain person, and (3) such person must have known that the property was stolen and it must be received by him with intent to deprive the true owner of the property.

The property received must be the identical property which was stolen, not something for which the stolen property has been exchanged.

Where a clerk in a banking institution obtained possession of blank certificates of stock, forged the signatures thereon and used them as collateral for a loan from a firm in an adjoining State, which firm without any cash passing between the parties procured money to be deposited to the order of said clerk in his deposit account in a local trust company, one who received from said clerk the proceeds of a check drawn against said deposit account with knowledge that the money had been unlawfully obtained, cannot be held to have received the identical property stolen so as to constitute a crime under section 1308 of the Penal Law.

SHEARN, J., dissented, with opinion.

First Department, January, 1919.    [Vol. 185.

APPEAL by the People of the State of New York from an order of the Supreme Court, made at the New York Special Term and entered in the office of the clerk of the county of New York on the 18th day of January, 1918, sustaining a writ of habeas corpus and discharging the relator from custody.

*Don Carlos Buell* of counsel [*Robert D. Petty* with him on the brief; *Edward Swann, District Attorney*], for the appellant.

*George W. Bristol,* for the relator.

DOWLING, J.:

In 1913 James E. Foye was a clerk employed in the transfer department of the Farmers' Loan and Trust Company in the city of New York at a salary of $75 a month. He corresponded with Charles T. Brown of Philadelphia, who had advertised in the newspapers his ability to loan money, and inquired of the latter if he would loan $10,000 on Foye's note for six months with Stock Exchange collateral. On receiving a reply in the affirmative, Foye, who had obtained possession of twenty-six blank certificates of stock of the General Electric Company through his position with the trust company, and which properly should have been in the custody of the latter, forged the signatures on such certificates, and one of these certificates purporting to show that he, Foye, was the owner of 100 shares of such stock, he sent to Brown at Philadelphia. Brown did not send the proceeds of this loan direct to Foye, but the transaction was handled in the following way: Brown collected the amount of the loan from the source from which he obtained it, and then had his own check for the amount of the loan certified and turned it into his bank in Philadelphia — in this case, the Corn Exchange National Bank of Philadelphia — and by his direction the Corn Exchange National Bank of Philadelphia sent a wire in code to the Seaboard National Bank of New York, confirmed by a letter bearing date the same day, October 23, 1913, by which the Corn Exchange National Bank directed the Seaboard National Bank to deposit with the Columbia-Knickerbocker Trust Company for the use of James E. Foye $9,700, to be charged to the account of the Corn Exchange National Bank. The Sea-

board National Bank thereupon drew its cashier's check to the order of the Columbia-Knickerbocker Trust Company, " use of James E. Foye," for the sum of $9,700, which check was paid through the Clearing House on October twenty-fourth. As the transaction had gone through safely, Foye on November eleventh and November fourteenth put through similar loans from Brown, one on 500 shares of General Electric, on which there was placed to his credit in the same way $48,437.50, and a further loan of $40,000 by which he was credited with the sum of $38,740. The method followed in each of these loans was the same as that used on the first loan, except that the second loan was handled by the Franklin National Bank of Philadelphia through its wire to the Mechanics and Metals National Bank of New York, which in turn sent its check to the Columbia-Knickerbocker Trust Company for the use of James E. Foye, and the check was paid in like manner through the Clearing House; and the third remittance was made through the Land Title and Trust Company of Philadelphia, which wired to the Seaboard National Bank of New York, which in turn turned over its check to the Columbia-Knickerbocker Trust Company for the use of James E. Foye, which check was in like manner paid through the Clearing House on the following day.

In none of these transactions did any cash pass between the parties, and the documents were the sole evidences or results of the dealings between them, the rest of the transactions being bookkeeping entries as the result of which a credit was opened for Foye in the Columbia-Knickerbocker Trust Company aggregating nearly $100,000. Foye thereafter drew against this account and on November 28, 1913, when an attachment was issued against his property, he had some $40,000 left therein. In the interim on November eighteenth Foye drew his check against this account for $25,000 and had the same cashed at the paying teller's window. Of course, this cash was money which had been intermingled from various accounts and sources, so that there is neither proof nor claim that the money which was paid to Foye represented his own particular account or any other specific source in the bank. As matter of fact, Foye had never deposited any cash in the

trust company, nor had any cash been transmitted to it from Philadelphia or by the New York banks upon any one of the three loans; so that there is no contention that any specific money can be traced from the hands of either Brown or his principals into the hands of Foye.

Foye had known the relator about a year and the testimony clearly establishes the nature of their relationship as well as the fact that she had knowledge that he was engaged in some criminal operation by which he hoped to steal a lot of money. It does not appear that she knew anything of the details of the method by which Foye hoped to get this money, and the only think definite which he seems to have told her was that he expected to realize from $10,000 to $100,000 and that the money was to be obtained in Philadelphia. After Foye had put through the three loans he told the relator that he had given his wife $20,000 to protect her in case he was arrested, whereupon he says the relator suggested that he give her $20,000 also to protect her in case of his arrest, and that thereupon he agreed to give her $20,000 with which to open a bank account and later to invest it in stocks, and a further sum of $1,000 for expenses and clothing for her use on their prospective elopement to California. On November 18, 1913, after Foye had drawn the $25,000 from the trust company, he put $21,000 of the amount in an envelope and gave the money to the relator while they were riding in a taxicab after having counted out the money for her. Relator deposited this sum in the Astor Trust Company and by various withdrawals finally closed the account May 19, 1915.

On November 25, 1913, Foye was arrested, extradited to Pennsylvania, and convicted of fraudulently making a written instrument in the Court of Quarter Sessions of the Peace for the county of Philadelphia, and on December 30, 1913, was sentenced to a term of five to ten years in the State Penitentiary for the Eastern District of Pennsylvania. The indictment charged the crime as having been committed in fraud of Charles T. Brown trading as Charles T. Brown & Co. This was the person with whom the transactions were had in Philadelphia. Foye was pardoned some three years later and called on relator's husband and brother-in-law for the apparent purpose of getting back the $21,000 which he had

given to relator, and when he failed in so doing he called upon the complainant, who was a detective in the employ of the attorneys for Chandler Brothers & Co., Brown's principals. The present prosecution is based on the complaint of Norman J. Fitzsimmons, the detective, who makes affidavit of Foye's admissions to him that he feloniously stole from Chandler Brothers & Co. the sum of $100,000 and that Foye had informed relator on some four dates specified that he had stolen said moneys from Chandler Brothers & Co., and that Foye had subsequently handed to relator the sum of $21,000 in currency, and that relator accepted the same, knowing the same to have been stolen, and that she opened an account with the money in her name in the Astor Trust Company and then and there converted the same to her own use and purposes, knowing the said bills and money to have been stolen. The only supporting affidavit is that of an employee of the Bankers Trust Company as to the relator's account with that company.

The section of the Penal Law under which the complaint is made is 1308, formerly known as section 550 of the Penal Code, and reads as follows: " A person, who buys or receives any stolen property, or· any property which has been wrongfully appropriated in such a manner as to constitute larceny according to this article, knowing · the same to have been stolen or so dealt with, or who corruptly, for any money, property, reward, or promise or agreement for the same, conceals, withholds, or aids in concealing or withholding any property, knowing the same to have been stolen, or appropriated wrongfully in such a manner as to constitute larceny under the provisions of this article, if such misappropriation has been committed within the State, whether such property were so stolen or misappropriated within or without the State, * * * is guilty of criminally receiving such property."

Under this statute there must be three concurring facts to constitute the crime: (1) The property must have been stolen by someone; (2) it must have been bought, received, concealed or withheld by a certain person; and (3) such person must have known that the property was stolen, and it must be received by him with intent to deprive the true owner of the property. (*People* v. *Hartwell*, 166 N. Y. 361; *People*

v. *Walker*, 198 id. 329; *People* v. *Acerno*, 184 App. Div. 541, 542.)

The question which arises in this case is whether the relator received the identical property stolen. For the statute does not cover the case of the receiving of other property into which stolen property has been converted, nor is there any contention that such a crime ever existed at common law. The reasons which led to declaring the receiving of the identical property stolen with guilty knowledge and with intent to deprive the true owner of his property, to be a crime are apparent. But these reasons do not apply to cases where the property stolen has lost its identity and no longer represents what the original owner had in his possession. The general proposition seems to be unquestioned as laid down in 34 Cyc. 517: " The property received must be the identical property which was stolen, not something for which the stolen property was exchanged." That this is the law in this State as well as in every other jurisdiction is clearly recognized in *People* v. *Ammon* (92 App. Div. 205; affd., without opinion, 179 N. Y. 540). In the opinion of the court, written by Mr. Justice Ingraham, the conviction of Ammon as a receiver of stolen property was held to have been proper because, although the actual cash, amounting to $30,500, had been turned over to the receiving teller of the bank by Miller to be counted, in the presence of himself and Ammon, the disposition of the money to be determined by Miller pending its counting, still Miller would have been entitled to receive back at any time before it was finally deposited by Ammon the identical money which was in the hands of the teller. The opinion holds that Miller never parted with title to the money until with his consent it was transferred to Ammon and by the latter deposited with the bankers. The court says (p. 209): " When the defendant made out the deposit slip which placed this money to his credit, and that slip was received by the banking house with the money, whether it was in the defendant's actual custody or not, he then received the money which, prior to that time, had been in possession of Miller, and appropriated it to his own use." Furthermore, the court charged the jury in that case that it was necessary, before they could convict, to find " that at the time the

defendant received the said sum of $30,500 he actually took it into his possession for the purpose of claiming ownership in the identical money which had been stolen by said Miller."

The *Ammon* case recognizes throughout the doctrine that the receiver cannot be convicted unless he has obtained possession of the identical property stolen. I find no later case which questions, overrules or distinguishes the law laid down in the *Ammon* case, and I think it is decisive of the question now before us. There never was any money which passed between Philadelphia and New York. The actual cash of Chandler Brothers & Co. or Brown never came into the possession of Foye. What Foye received was money taken from the general funds of the trust company and paid to him on account of the credit which had been opened for him as the result of the Philadelphia transactions. Thus, the money of the real complainants in this case, Chandler Brothers & Co., whether in the shape of cash or check, was passed over to Brown, and then he deposited his own certified check with a Philadelphia bank, which bank merely notified a New York bank to send its check to the Columbia-Knickerbocker Trust Company to be there deposited to the account of Foye. These successive bookkeeping transactions, it seems to me, have entirely destroyed the identity of any property which originally belonged to Chandler Brothers & Co. What passed into the possession of Foye was something entirely different from what left the possession of Chandler Brothers & Co. It is as if Foye, having stolen an automobile in Philadelphia, had exchanged it for horses as he passed through New Jersey, and then again exchanged those horses for a diamond ring in New York, which he gave to the relator. I do not think it could be held, under the New York statute or any other which has been called to our attention, that relator would have been guilty of the crime of criminally receiving stolen property, even if she had known that Foye's original taking of the automobile in Pennsylvania was felonious. If modern business methods require such an extension of criminal liability as will make persons guilty of criminally receiving stolen property who receive the proceeds of a thief's operations, no matter how often the original stolen property has changed

First Department, January, 1919.          [Vol. 185.

its character on the way, then the remedy is by legislative act, and not by an extension of what seems to me the clear meaning and intent of the present act.

I favor the affirmance of the order appealed from.

CLARKE, P. J., SMITH and PAGE, JJ., concurred; SHEARN, J., dissented.

SHEARN, J. (dissenting):

The relator, having been held after a hearing before a city magistrate to answer to the Court of General Sessions upon the charge of having feloniously, and with intent to conceal and secrete, received from one Foye property stolen by him, to wit, " currency of the good and lawful money of the United States of America of the value of $21,000," has been discharged upon habeas corpus proceedings. There is no question but that Foye stole $21,000, and that the relator received and withheld the money knowing that it was stolen. This miscarriage of justice has resulted because, it has been conceived, the stolen money thus received was not the identical money stolen. This supposed lack of identity results from forms of bookkeeping incidental to modern banking methods and to certain safeguards, growing out of the law merchant, which have been adopted for the protection of honest business men and were not designed for the protection of criminals.

It appears that Foye, in 1913, was a clerk in the transfer department of the Farmers Loan and Trust Company in New York city, and thus an opportunity was afforded him to obtain possession of blank certificates of stock of the General Electric Company. Foye took twenty-six of such blank certificates, forged ten of them for 100 shares each and fraudulently induced Charles T. Brown & Co. of Philadelphia to loan to him at three different times in the aggregate $100,000 upon the forged certificates as collateral security. After arranging for these " loans," Foye arranged with the Columbia-Knickerbocker Trust Company of New York city to open an ordinary deposit account with him, notified Brown & Co. of this fact and instructed Brown & Co. to forward to that trust company for his account the sums " loaned." Brown & Co. did as instructed and its remittances were credited to Foye by the

Columbia-Knickerbocker Trust Company. No other credits ever went into this account except those fraudulently obtained from Brown & Co. The channels through which the credits were transmitted by Brown & Co., which finally made up Foye's credit in his account with the Columbia-Knickerbocker Trust Company, have been deemed of some importance, and I will state a typical instance, although to my mind these facts are of no controlling importance as the various intermediaries were merely the agents of Brown & Co. in transmitting the credits. (*People* v. *Dimick*, 107 N. Y. 13, 32.) The first " loan " was for $10,000. Deducting the interest, payable in advance, Brown & Co. on October 23, 1913, drew its check on the West End Trust Company of Philadelphia for $9,700; that trust company through some arrangement with the Corn Exchange National Bank of Philadelphia procured the Corn Exchange National Bank to remit by wire $9,700 through its correspondent, the Seaboard National Bank of New York, for " use of James E. Foye," and charged its account for the same; the Seaboard National Bank sent to the Columbia-Knickerbocker Trust Company its check for $9,700 drawn to the order of the Columbia-Knickerbocker Trust Company for " use of James E. Foye," which check was subsequently paid. Foye had no relations with any of these institutions except the Columbia-Knickerbocker Trust Company, received no benefit from any of the transactions until a credit was established in the Columbia-Knickerbocker Trust Company, and, it seems entirely apparent, no matter how many intermediaries there were they were mere agents and subagents in forwarding the money in the shape of a credit, which credit Brown & Co. did not lose control of and could have stopped on discovery of the fraud, at least up to the point being reached when the amount in question was credited to Foye in the Columbia-Knickerbocker Trust Company. The relation between Foye and the Columbia-Knickerbocker Trust Company was that of debtor and creditor. Foye was the apparent owner of the credit, although of course in reality the credit, being stolen and representing nothing but a theft, belonged to Brown & Co. (*Rothschild* v. *Mack*, 115 N. Y. 1, 8; Halsbury's Laws of England, vol. 9, p. 702, ¶ 1387.) So far as the credit in the account was represented by money in the possession of

the Columbia-Knickerbocker Trust Company, hereinafter called the trust company, legal title thereto was in the trust company. Thus far, it will be observed, Foye had never obtained actual possession of any of Brown & Co.'s money, although it had come under his control by virtue of Brown & Co.'s having caused a deposit to be made to his credit. On November 18, 1913, Foye drew from the trust company and was handed by the cashier $25,000 in cash, the denomination of the bills being two $5,000 bills and fifteen $1,000 bills. When this money was in the hands of the cashier, legal title to it was in the trust company. *When it went into the possession of Foye, whose money was it?* Clearly it was not Foye's. His possession of the money was the consummation of a series of acts constituting larceny. The money in Foye's hands belonged to Brown & Co. and was stolen. Of this stolen money, thus coming into Foye's possession for the first time, he handed two $5,000 and eleven $1,000 bills to the relator, who was well aware that the money was stolen and who thereafter secreted and withheld the same although entirely familiar with Foye's scheme of operation. Yet it has been held that the relator did not commit the crime of receiving stolen property because the money received from the thief Foye was not the identical money parted with by Brown & Co. for the reason that, before getting into the actual possession of Foye, the money, by virtue of the banking conveniences adopted for its transmission to the thief, became commingled with the funds of the trust company and was represented by a mere credit in a deposit account in relation to which, as a matter of law, the trust company was a debtor and Foye was a creditor.

In arriving at this result, it seems to me that the learned justice at Special Term has unnecessarily subordinated substance to form. The real question is whether the money received by the relator from Foye was stolen money when it for the first time came into Foye's hands over the counter of the trust company. The mere fact that, in the process of transmission from owner to thief, the money went into a deposit account and became commingled with the moneys of the trust company does not in any sense determine whether or not the money received by the thief from the trust company

was stolen money in his hands. This is demonstrated by *People* v. *Lammerts* (164 N. Y. 137). In that case the proof showed that defendant, as county treasurer, drew a check upon a bank in which the money of the county was on deposit subject to his order and control, personally took the same to the bank and exchanged it for a draft payable to a third person to whom he delivered it in satisfaction of a judgment against himself personally. The draft was subsequently paid and the defendant's account as treasurer charged with the amount of the check. The transaction was, as the court held, in effect the same as if the cashier of the bank had paid the money over personally to the defendant and then the defendant had taken and passed it back to the cashier in payment for the draft. Now, upon a claim of variance between the proof and the indictment, it became necessary to determine whether the defendant had received and misappropriated *the money of the county.* Upon the debtor and creditor theory, the money of the county, when deposited and mingled with the funds of the bank, became the property of the bank and the latter became a debtor of the county. But, as the Court of Appeals unanimously held, " the instant the money was paid over upon the check it became the county's money." So here, the instant the money was paid over to Foye it became the money of Brown & Co., the true owner, who had parted with it and had been induced to transmit it through various intermediaries to Foye under circumstances which made Foye guilty of larceny the moment he appropriated it to his own use or to the use of any one other than the owner. Concededly a different situation would be presented if Foye's account in the trust company had been made up partly of stolen money and partly of money lawfully belonging to him. But in this case the situation is simplified by the fact that the entire deposit in the trust company was money stolen from Brown & Co., and which first came into Foye's possession when handed over the counter of the trust company. Therefore, it cannot be doubted, as it seems to me, that the money received by Foye and turned over to the relator was stolen money. As this stolen money is unerringly traced from Brown & Co., the owner, to Foye, the thief, and as there are involved no equities of third persons,

no claims of the trust company or of any other persons acting in good faith, it seems to me unduly technical to contend that the money thus obtained by Foye and turned over to the relator was not the identical money that Brown & Co. parted with. I should be of the same opinion even if Foye had stolen currency out of the till of Brown & Co., deposited it in an account opened for the purpose, containing nothing but the stolen money, and had thereafter drawn the money out on check and turned it over to a receiver. The operation of depositing the money for a few minutes in a bank and then drawing it out again could work no immunity to the person receiving the money with full knowledge of the transaction. Still less should any such claim be supported in a case like this, where the defrauded party has been led to make a deposit for the account of the thief and the latter's first actual possession of the money is when the bank of deposit honors his check upon it.

A fictitious importance has been attached to whether or not the money that was turned over to the relator was the identical money that Foye could have been said to have stolen *originally*, whereas the true inquiry is whether it was stolen money. It may well be that Foye could have been convicted of larceny consummated when the credit was entered in the books of the trust company, although this is not free from doubt. (*Phelps* v. *McQuade*, 158 App. Div. 528.) But even if Foye could be said to have been guilty of larceny when the account was actually opened by a deposit therein, he was none the less guilty of larceny when he drew money out of the account and appropriated it to his own use. The question is not whether the money turned over to the relator was the money that Foye originally stole, or whether he had stolen it before, or how many previous crimes he had committed in the transaction beginning with the original larceny of the General Electric Company's certificates of stock. The essential question is, was the money which Foye turned over to the relator stolen money from the moment that it came into his possession over the counter of the trust company? I am of the opinion that the money received by Foye from the trust company was, in Foye's hands, stolen money, because stolen it belonged to Brown & Co., and that this identical

stolen money was received by the relator under circumstances which, upon this record, establish a violation of section 1308 of the Penal Law.

The order appealed from should be reversed, the writ of habeas corpus dismissed, and the relator remanded to the custody of the defendant.

Order affirmed. Order to be settled on notice.